UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

CELLCO PARTNERSHIP *d/b/a* VERIZON WIRELESS          **COMPLAINT**

1:17-cv-273 (FJS/DJS)

Plaintiff,

vs.

TOWN OF CLIFTON PARK, NEW YORK, THE
ZONING BOARD OF APPEALS OF THE TOWN OF
CLIFTON PARK, THE PLANNING BOARD OF THE
TOWN OF CLIFTON PARK, THE DEPARTMENT OF
PLANNING OF THE TOWN OF CLIFTON PARK,
AND THE DEPARTMENT OF BUILDING AND
DEVELOPMENT OF THE TOWN OF CLIFTON PARK

Respondents.
_____

Plaintiff Cellco Partnership *d/b/a* Verizon Wireless ("Plaintiff" or "Verizon Wireless"),

by and through its attorneys, alleges as follows:

## INTRODUCTION

1.       The Nation's wireless infrastructure is a critical communications pathway that is

extensively employed and heavily relied on by the public – including residents and businesses,

the traveling public, emergency service providers, hospitals and health care professionals, law

enforcement personnel, government officials, and the 911 North American emergency system -

and that is increasingly serving as a replacement for traditional wireline phones altogether. Both

Congress and the Federal Communications Commission ("FCC") have emphasized the

importance of a seamless nationwide wireless network and the need to allow wireless carriers to

move quickly to fill gaps in their coverage. This case involves just such a coverage gap in the

Town of Clifton Park, New York ("Town").

1

2.     Plaintiff Cellco Partnership *dba* Verizon Wireless ("Verizon Wireless" or "Plaintiff") has been forced to bring this Complaint because the Town has denied its application for local zoning approvals to construct and operate a new wireless telecommunications facility on a parcel of land in an area of the Town experiencing a significant gap in service, a facility that would be substantially screened from view due to its camouflaged construction as a one-hundred (100) foot stealth monopine tree and its location within a very thick, mature set of trees that average eighty-five (85) feet in height.

3.     As a stealth monopine tree, the proposed facility is classified under the Town's Zoning Law as an "Alternative Tower Structure" and, after collocation on existing communications sites or tall structures, is at the top of the Town's hierarchy for siting preferences and is an allowed use in all zones.  *See* Town Zoning Law at §§208-95(B) & (D)(2)-(3).

4.     The Town's denial was based on specious grounds that are not supported by substantial evidence in the record and equates to a prohibition on the provision of personal wireless services because the proposed telecommunications facility is the least intrusive means for closing a significant gap in wireless coverage.

5.     The Town's denial is in blatant disregard of controlling New York precedent regarding the applicable standards to be applied when considering zoning approvals for wireless carriers seeking to locate a telecommunications facility, as articulated in *Cellular Tel. Co. v. Rosenberg*, 82 N.Y.2d 364, 372 (1993).

## JURISDICTION AND VENUE

6.     This Court has federal question jurisdiction over this action under 28 U.S.C. §1331, because it arises under the Federal Communications Act of 1934, as amended by the

Telecommunications Act of 1996 (the "TCA"), in particular 47 U.S.C. §332(c)(7)(B).   This Court also has jurisdiction over this action under 28 U.S.C. §1337(a), because the Federal Communications Act and the TCA are acts of Congress regulating commerce.

7.     Pursuant to 28 U.S.C. §1367, this Court also has supplemental jurisdiction over the State law claims under Article 78 of the New York Civil Practice Law and Rules ("CPLR").

8.     This Court has jurisdiction to order declaratory and injunctive relief under 28 U.S.C. §§2201 and 2202 because there is an actual controversy between the parties.

9.     Venue is proper in this district under 28 U.S.C. §1391(b), because the Defendants are located in this district, "a substantial part of the events or omissions giving rise to the claim occurred" in this district, and "a substantial part of property that is the subject of the action is situated" in this district.

## EXPEDITED PROCEEDING

10.     Pursuant to 47 U.S.C. §332(c)(7)(B)(v) of the TCA, Verizon Wireless respectfully requests expedited treatment of this Complaint.

## PARTIES

11.     Plaintiff Cellco Partnership *dba* Verizon Wireless ("Verizon Wireless") is a Delaware General Partnership with its principal place of business at One Verizon Way, Basking Ridge, New Jersey 07920, and is licensed by the FCC to provide wireless services throughout New York State, including commercial mobile services and personal wireless services, as those terms are defined under federal law, in and around Clifton Park, New York.

12.     Defendant Town of Clifton Park is a town in Saratoga County, New York, incorporated under New York law.

13.     Defendant Board of Appeals of the Town of Clifton Park, also known as the Zoning Board of Appeals ("ZBA"), is an administrative board of the Town and is responsible for, *inter alia*, issuing use and area variances in accordance with Article XV, §208-109(C), of the Code of the Town of Clifton Park ("Code").

14.     Defendant Planning Board of the Town of Clifton Park ("Planning Board") is a body duly created by the Town and is responsible for issuing site plan approvals and special use permits in accordance with Articles XIV, §208-95, and XVI, §208-115 of the Town's Code.

15.     Defendant Department of Planning of the Town of Clifton Park, *inter alia*, coordinates the review process for all pending site plan applications, advises the Planning Board and ZBA on planning and development matters, serves as staff to the Planning Board and reviews projects for conformance to the zoning regulations.  *See* Town Code Chapters 36 and 208 and www.cliftonpark.org/townhall/planning/.

16.     Defendant Department of Building and Development of the Town of Clifton Park ("Building Department") is an administrative department of the Town and is responsible for issuing building permits in accordance with Town Code Chapters 5, 73 and 208.

**THE WIRELESS INDUSTRY**

17.     The wireless industry is experiencing unprecedented growth. National data indicates that as of December 31, 2015, there were approximately 377.9 million subscriber connections active in the United States, an increase of more than 22.5 million connections over the prior year (December 2014), which was preceded by growth of approximately 19.8 million connections the year before that (December 2013).

18.     Subscriber usage on the Verizon Wireless network is more than doubling year-over-year, and this trend is expected to continue for the foreseeable future. For example, data

from the Centers for Disease Control and Prevention indicates that (a) approximately 35.8% of all adults and children live in households that have replaced landline service with only wireless service, and (b) nearly one in six American homes (15.9%) receive all or almost all calls on wireless devices despite also having landline service. This trend, referred to as "cutting the cord", is increasing and, as a result, wireless networks must now handle communications from multiple wireless devices owned by multiple members of a household (that previously were addressed by a single household connection to the landline system).

19.     The FCC reports that the number of 911 calls from mobile phones has significantly increased in recent years with an estimated 70% of all 911 calls now being made from mobile devices. That percentage is continuing to grow.

20.     From a public safety standpoint, advances in wireless technology are causing the federal government to rapidly move forward with plans to upgrade the 911 system to enable the acceptance of all manner of wireless communication, including text messages, photos and video. The FCC is also engaging in efforts to make modern wireless and broadband devices accessible for emergency and non-emergency use to persons with disabilities. For these new services to function properly, additional network capacity and bandwidth are critical.

21.     In this context, wireless telecommunications of all forms are vital to the public welfare, safety and convenience and are not a mere luxury or entertainment item. To ensure the continuity of emergency and non-emergency wireless telecommunications within the broader Verizon Wireless network, it is imperative that network coverage and capacity needs be addressed promptly, so that the Verizon Wireless network can continue to function without interruption during emergencies and catastrophic conditions.

22.     Notably, the President of the United States recognized the critical nature of the wireless industry to the nation when he proclaimed that "cellular phone towers" are "critical infrastructure" and that "critical infrastructure protection is an essential element of a resilient and secure nation.  Critical infrastructure are the assets, systems, and networks, whether physical or virtual, so vital to the United States that their incapacitation or destruction would have a debilitating effect on security, national economic security, public health or safety."  Federal Register Volume 74, No. 234, page 64585 (December 8, 2009).

## REGULATORY FRAMEWORK

23.     With the passage of the TCA, Congress created a new telecommunications regime designed to promote competition and higher quality services for American telecommunications consumers and to encourage the rapid deployment of new telecommunications technologies.

24.     In furtherance of these goals, the TCA reduces the impediments posed by local regulations by placing certain restrictions on the regulatory powers of local governments with regard to the siting and placement of personal wireless service facilities.

### *The Relevant TCA Provisions*

25.     Section 332(c)(7) of the TCA imposes a number of procedural and substantive limitations on local zoning decisions to ensure that those decisions do not frustrate the TCA's goals of promoting competition, higher quality services and the rapid deployment of new telecommunications technologies.

26.     Section 332(c)(7)(B)(i) provides that:

> The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof –
>
> (I)      shall not unreasonably discriminate among providers of functionally equivalent services; and

(II)    shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

27.    Section 332(c)(7)(B)(iii) requires that:

Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

28.    Section 332(c)(7)(B)(iv) provides that:

No State or local government or instrumentality thereof may regulate the placement, construction, and modification of personal wireless service facilities on the basis of the environmental effects of radio frequency emissions to the extent that such facilities comply with the Commission's regulations concerning such emissions.

29.    Section 332(c)(7)(B)(v) provides that:

Any person adversely affected by any final decision or failure to act by a State or local government or any instrumentality thereof that is inconsistent with this subparagraph may, within 30 days after such action or failure to act, commence an action in any court of competent jurisdiction. The court shall hear and decide such action on an expedited basis…

30.    This action is ripe for determination under the TCA and was timely filed.

### State and Local Government Zoning Requirements

31.    Because of the essential nature of its services, Verizon Wireless is considered a public utility under New York decisional law.

32.    As a public utility, Verizon Wireless is entitled to a less rigorous standard of review with regard to any applications for approval of a personal wireless service facility by State and local zoning authorities, such as the Defendants.

33.    Article XIV, Section 208-95, of the Town's Code governs Communications Towers, as broadly defined therein.

34.     Under Article XIV, Section 208-95, of the Town's Code, Defendant Planning Board must issue a Special Use Permit ("SUP") for all new construction of communications towers and facilities within the Town and must approve the placement of antennas and accessory equipment.  The standards for granting a SUP are listed in Article XIV, Section 208-79, of the Code.

35.     Under Article XIV, Section 208-95(E), Defendant Planning Board must also issue site plan approval for communications towers. The requirements for site plan review are listed in Article XVI of the Code.

36.     Under Article XIV, Section 208-95(E)(3), of the Town's Code, the construction of new communications towers is prohibited in certain zones, including Residential 1 Districts (R-1), and new communications towers are also "prohibited within 500 feet of the property line of any existing residential property within" the R-1 zone.

37.     Under Article XV, Section 208-109(C), Defendant ZBA is empowered to issue use and area variances to enable a use or configuration which is not in accordance with or is prohibited by the Town's Code.  Accordingly, relief from the prohibitions in Section 208-95(E)(3) of the Town Code requires the issuance of a variance from Defendant ZBA.

38.     However, a stealth monopine tree, such as the one ultimately proposed by Verizon Wireless, qualifies as an "Alternative Tower Structure" under the definitions provided in the Zoning Law at 208-95(B).  More specifically, an Alternative Tower Structure is defined as:

> Clock towers, bell steeples, light poles and similar existing or new structures or other manmade structures <u>which suitably camouflage or are designed to camouflage or conceal the presence of antennas and other wireless communications equipment</u> without the necessity of constructing new freestanding communications towers.

39.     As a structure that camouflages its presence, the proposed facility constitutes an Alternative Tower Structure, as defined in the Town's Code, and is therefore given the second

highest preference in the Town's siting hierarchy immediately after collocation on an existing tower or other tall structure (there are no existing towers or tall structures in this area of the town).  Town Zoning Law §208-95(D)(3)(b).

40.     As an Alternative Tower Structure, the proposed Facility is an allowed use in all zoning districts in the Town, including residential districts.  Town Zoning Law §208-95(D)(3).

41.     Despite the fact that the proposed stealth monopine tree is an allowed use in all zoning districts, Defendant ZBA treated it as needing a use variance and then compounded this error by applying the incorrect legal standard to deny the use variance.

## VERIZON WIRELESS'S APPLICATION TO CONSTRUCT A WIRELESS COMMUNICATIONS FACILITY

42.     On May 2, 2016, Verizon Wireless submitted an application to the Defendant Planning Board and Defendant ZBA for a special use permit, site plan approval, and a use variance ("Application") in connection with its original proposal to construct and operate a 100-foot monopole telecommunications facility (104' when including a 4' lightning rod) and associated improvements and equipment on property located at 329 Moe Road in Clifton Park, Saratoga County, New York. The purpose of the project was to address a significant gap in wireless coverage in a portion of the Town.

43.     Plaintiff's Application included the requisite fees, forms and drawings, along with all of the additional, required documentation, including (without limitation) (i) a Statement of Intent detailing the project, (ii) a Full Environmental Assessment Form ("EAF") under the State Environmental Quality Review Act ("SEQRA") prepared by Tectonic Engineering & Surveying Consultants P.C. ("Tectonic"), (iii) a redacted Option and Land Lease Agreement with the property owners, (iv) a Radio Frequency (RF) and Site Selection Analysis prepared by Rick Andras, an RF Design Engineer with the Verizon Wireless Network Engineering Department

9

and by Sara Colman, a Site Acquisition Specialist with Airosmith Development, Inc.,  (v) an RF Safety Report prepared by Millennium Engineering, P.C. ("Millennium"), and (vi) a Visual Resource Evaluation Report with photosimulations and SEQRA Visual EAF Addendum prepared by Tectonic.

44.     Plaintiff's May 21, 2016 Application is annexed hereto as **Exhibit A**.

45.     By letter, dated June 22, 2016, Plaintiff supplemented its application with an additional area variance request to allow the proposed monopole telecommunications tower to be constructed within 500 feet of a residential lot line.

46.     Meetings and public hearings with Defendants ZBA and Planning Board concerning the project occurred on multiple dates, including June 28, 2016 (initial presentation to Planning Board), July 19, 2016 (initial presentation to ZBA and public hearing), September 20, 2016 (ZBA meeting and public hearing), October 18, 2016 (ZBA meeting and public hearing), December 6, 2016 (ZBA meeting and public hearing) and February 7, 2017 (ZBA meeting and public hearing).

47.     Public comments both for and against the proposal were received and considered at the numerous public meetings and hearings for the project.

48.      Pursuant to New York State General Municipal Law §239-m, the matter was also referred to the Saratoga County Planning Board, which considered the matter at a meeting on December 15, 2016.

### The Facility

49.     The unmanned public utility/personal wireless service facility, as originally proposed, was a 100-foot monopole tower made of galvanized steel with panel antennas on a three sided array on the top and a four-foot lightning rod that extended its height to 104 feet. To

accommodate the Town's aesthetic concerns, the proposed facility was later modified to a 100-foot stealth monopine tree, with antennas at the 91-foot center line height ("Facility").   See Supplemental Application Materials dated September 20, 2016 annexed hereto as **Exhibit B**.

50.     The stealth monopine tree will have an antenna array at 91-feet above ground level ("AGL"), with a 95-foot support structure that measures 100 feet at the top of its stealth branches. The monopine will be designed to accommodate an antenna array for one additional carrier (owing to the existing 85' tall trees around the site).

51.     Consultation with the Federal Aviation Administration confirmed that aircraft obstruction lighting or marking is not required at the Facility.  See Exhibit B at page 93.

52.     The Facility is proposed within a 100+/- ft. x 100+/- ft. (10,000+/- sq. ft.) lease area with an easement for access and utilities on a portion of lands owned by Gordon E. and Valerie Just at 329 Moe Road in the Town ("Site") and located in the R-1 residential zoning district. The Facility will be substantially and naturally screened from view, because it will be located on a small portion (0.65 acres of total disturbance) of a much larger parcel of land (6.65 acres) and will be surrounded by a very thick set of existing, mature trees that average 85 feet in height and have a screening depth of between 35' and 120' feet on-Site. *See* photosimulations of the proposed stealth monopine at Exhibit B pages 57-93.

53.     The Facility includes an equipment platform approximately 11.5 ft. x 16 ft. in size and associated antennas, improvements and access/utilities. This base station will be surrounded on all sides by a 75 ft x 75 ft fenced enclosure (within the 100' x 100' leased area of the property). Although Verizon Wireless originally proposed a six-foot chain link fence (with three strands of barbed wire at the top) for the enclosure, it agreed to install a stockade fence of the same height on the two sides that are not fully screened by the existing trees from view, along

with staggered Evergreen plantings to further improve the aesthetics of the base station equipment.

54.     The Facility will be unmanned and will be visited for routine maintenance approximately 1-3 times per month. Access to the Facility will be provided by a 12-foot wide driveway (gravel and crushed stone base) and there will be a small parking area for 1-3 vehicles for the infrequent maintenance visits.

55.     The Facility is an allowable land use subject to Verizon Wireless obtaining a Special Use Permit and Site Plan Review Approval.

56.     If considered a standard communications facility, rather than an Alternative Tower Structure under the Town's Code, Verizon Wireless must also obtain a use variance from Defendant ZBA due to the Facility's location in the R-1 Zone. Because the identified gap in wireless service is located in this residential R-1 zone, a very dense suburban area, Verizon Wireless must site the Facility in the R-1 zone in order to adequately service the identified coverage gap.

57.     If considered a communications facility, rather than an Alternative Tower Structure, Verizon Wireless must also obtain an area variance from the Town's 500' residential lot line setback requirement, because the nearest residential lot line is less than 500' away from the Facility. Again, because the identified gap in service is located in a residential area and because the lots in this area are predominantly small in size, it is impossible for Verizon Wireless to adequately service the identified coverage gap by locating a Facility on a parcel that allows for compliance with the 500' lot line setback requirement.

58.     Even though the Facility will be located in a residential zone and will be within 500 feet of a residential lot line, the nearest residential structure to the proposed Facility will be

12

greater than 700 feet away. Moreover, the project will comply with the Town's requirement that a telecommunications tower and all antennas and appurtenances be set back from all lot lines a distance equal to 110% of the height of the structure, so that substantially all ice-fall or debris will be contained on-Site in the unlikely event of a failure.

59.     Because Verizon Wireless is a public utility, its application for municipal approvals is not governed by the ordinary land use standards and, instead, it need only show that approval is "required to render safe and adequate service" and that there are "compelling reasons, economic or otherwise," for needing the variance. *Cellular Tel. Co. v. Rosenberg*, 82 N.Y.2d 364, 372 (1993). One such compelling reason is the elimination of service gaps in its wireless network. *Id*.

60.     Strict application of the residential ban on communications facilities and the 500-foot setback rule to residential property lines in most areas of the Town results in a *de facto* zoning out of any communications tower regardless of actual visibility or impact, a critical factor to consider given the evolution of the wireless industry and the large percentage of the population that relies on wireless technology for their primary (if not exclusive) means of communication.

**The Facility Serves a Public Need and Gap in Wireless Service**

61.     The FCC mandates at 47 CFR §§ 22.940 and 24.16 that each wireless carrier must provide "substantial service" in its licensed service area or risk having its license revoked. The FCC defines "substantial service" as service that is sound, favorable, and substantially above a level of mediocre service.

62.     Under New York precedent, Verizon Wireless is a public utility that must be permitted to provide safe and effective service to its users.

13

63.     In order for Verizon Wireless to provide substantial, safe and effective service to its wireless users, it must have sufficient coverage and capacity. Coverage refers to the geographic area serviced by a wireless communication facility, whereas capacity refers to the amount of network traffic a given site can process before significant performance degradation occurs, such as in inability to access the network (e.g. inability to make a call), dropped calls, or poor call or data throughput performance while connected to the network.

64.     Verizon Wireless uses a minimum signal level of -95 dBm in the Long Term Evolution ("LTE") network to define adequate service in dense suburban regions - like the Town - with foliage, buildings and vehicles that serve as obstacles to radio wave penetration.

65.     To determine whether there is adequate wireless coverage, Verizon Wireless engineers use computer modeling to produce RF propagation plot maps that analyze and predict signal power levels in a given area with respect to the selected minimum signal threshold (e.g. -95 dBm). These RF propagation plot maps use various colors to depict the area surrounding a proposed facility where the RF coverage levels meet or exceed the minimum RF signal levels. The absence of color on an RF propagation plot map, which is represented as white, indicates those areas where wireless facilities cannot provide the minimum signal levels. These white areas are called coverage "gaps" and are indicative of areas experiencing unreliable wireless service.

66.     The purpose of the Facility is to provide adequate Verizon Wireless advanced 4th Generation (4G) LTE service to the southeastern portion of the Town and to ensure the provision of adequate and safe service (mobile and in-building) in a significant portion of the Town.

67.     Specifically, the Facility will extend coverage approximately 2.4 miles along Grooms Road, 1.8 miles along Moe Road, 1.2 miles along Englemore Road, along several miles

of local and community roads, and into homes and businesses across the southeastern portion of the Town ("Gap Area"). This Gap Area is illustrated in white on the propagation plot map attached as **Exhibit C** hereto.

68.     The limited coverage currently in the Town is provided by Verizon Wireless's existing telecommunications facilities located at Halfmoon Crossing, Grays Corners, Flagler Corners, and Clifton Park Center. These facilities are located a distance of about 1.6 to 2.3 miles from the proposed Facility. All other Verizon Wireless facilities are either too far away and/or blocked by the surrounding terrain and vegetative clutter to provide reliable service in the Town.

69.     A future Verizon Wireless site at the northwest corner of Exit 8 off I-87 (the "Vischer Ferry Site" in the Town of Halfmoon on an existing monopole) will provide coverage to a distinct and separate section of the Town of Clifton Park and therefore will provide complementary coverage but not appreciably new coverage to the targeted Grooms Road area. The coverage gap that will still exist after the Vischer Ferry Site becomes operational is illustrated in white on the RF propagation plot map attached as **Exhibit D** hereto.

70.     Due to technological constraints and interference caused by varying terrain, structures and vegetation, there is limited flexibility concerning the siting of a new wireless facility that will function properly and provide adequate service. Most of the area in and around the Gap Area, in particular, is thickly-wooded, dense suburban communities, including a few, large forested parcels of land.

71.     Due to the distance of the Gap Area from surrounding Verizon Wireless cell sites and the difficult terrain features that serve as a barrier to adequate wireless service, including a dense tree canopy along and near Grooms Road, the construction of a new, locally-based communications facility is required in order to provide a continuous level of communications

service to the Gap Area. This means that the Facility must be located in the R-1 zone in order to provide reliable service to the Gap Area.

72.     The proposed Facility will not only provide 4G wireless service to the Gap Area, it will also provide much needed and significant capacity improvements and relief across the southeastern portion of the Town. For example, the Facility will enable the Verizon Wireless Network to provide sufficient capacity to handle the projected 4G traffic growth near and neighboring the project.

73.     A number of residents confirmed to the Town that they do not receive adequate service in the Gap Area. However, because a limited number of nearby residents opposed the Facility by claiming that service in the Gap Area is sufficient and that a new wireless facility is not required, Verizon Wireless verified the coverage gap by submitting live network data collected using 4G equipment in a test vehicle connected to a computer to measure signal strength. This drive test recorded data points where coverage was outside the -95 dBm signal threshold and confirmed the wireless coverage gap in the Gap Area.

74.     Root Metrics is a third-party company that performs independent testing of wireless network performance from all major wireless carriers in the United States. Wireless carriers, like Verizon Wireless, use data collected by Root Metrics to determine where there are gaps in wireless coverage. The testing data collected by Root Metrics confirms that along Grooms Road and Moe Road, there are failures indicative of inadequate RF coverage, further confirming the Gap Area mapped by Verizon Wireless. These failure points identified by Root Metrics will be resolved by the construction of the Facility.

75.     In addition to the wireless coverage gaps that would be resolved by the Facility, there is a growing need for additional network *capacity* in the dense residential areas along

Grooms Road and Moe Road. For example, there are existing Verizon Wireless sites to the northwest and northeast of the proposed Project Site that have reached or are projected to reach their capacity limits within the next twelve (12) months. Accordingly, not only will the Facility provide adequate service in the Gap Area, it will provide much needed capacity relief to the Verizon Wireless sites serving neighboring areas of the Town.

76.     As detailed below, the Town's own expert consultant has confirmed the existence of a significant gap in wireless service in the Gap Area and has further confirmed that the project Site will address the gap in wireless service in the Town.

### *The Review of the Facility by the Town's RF Engineering Consultant and Verizon Wireless's Modifications to the Facility's Height and Appearance*

77.     The Town retained William P. Johnson, an electrical engineer and radio-frequency (RF) engineering consultant as well as a faculty member at the Rochester Institute of Technology, to review the Application for the Facility and to advise the Town. Professor Johnson is well-known in the telecommunications field and for many years has assisted municipalities in the technical review of telecommunication facility towers.

78.     On June 6, 2016, Professor Johnson reported to Defendant Town that there was a "significant gap area…near the intersection of Moe Road and Englemore Road where coverage is less than the -95 dBm threshold" and that in this gap area, "subscribers will generally experience unreliable service, if at all." *See* Professor Johnson's June 6, 2016 report, attached as **Exhibit E** hereto, at p. 4. Accordingly, he agreed that the "RF coverage gaps predicted by the RF propagation plot for existing coverage tends to demonstrate need." Exhibit E at p. 4.

79.     Professor Johnson also agreed that location of a communications facility on the Project Site would fill the Gap Area. Accordingly, he reported to the Town that Verizon Wireless

17

was "justified" in selecting the Project Site and that its coverage threshold of -95 dBm was "reasonable." Exhibit E at pp. 1 and 4-5.

80.     Professor Johnson confirmed that Verizon Wireless could not adequately address the identified gap by co-locating on the Vischer Ferry tower site or by locating a facility at the Town's transfer station, though he made note of the absence of a propagation plot showing composite coverage from both the proposed Facility and the Vischer Ferry tower site. Exhibit E at pp. 1 and 4.

81.     Professor Johnson also did not take issue with the rejection of the other alternate sites based on anticipated difficulties. Exhibit E at p. 5. He recommended, however, that Verizon Wireless make a presentation to the Town concerning the two alternate municipal sites and two alternate non-municipal sites that it had rejected, "to allow the board to fully understand the nature of the difficulties with each site." Exhibit E at p. 2.

82.     Because the Town expressed concern regarding the 100-foot tower height, Professor Johnson also recommended that Verizon Wireless technically evaluate whether the tower could be constructed at 90-feet or 80-feet by providing RF propagation maps for those reduced heights. Because of the existing tree canopy, however, he reported that it was "unlikely that a base station site will work well at heights much lower than the proposed 100'." *See* Exhibit E hereto at p. 4.

83.     Verizon Wireless addressed Professor Johnson's June 6, 2016 letter-concerns by supplementing its application with a propagation (coverage) plot showing the composite coverage of the proposed Facility and the proposed Vischer Ferry co-location site, along with propagation plots for composite coverage at the lower antenna heights of 80 and 90 feet. Attached hereto as **Exhibit F**.

84.     These composite coverage maps illustrate that because of the height of the surrounding tree canopy, there will be a continued gap in wireless coverage if the proposed Facility is constructed at a height of 60 or 80 feet (rather than the proposed 100' height). However, Verizon Wireless concluded that it could reduce the tower height to 90 feet without incurring significant coverage loss across the Gap Area, expressly noting that this reduction will adversely impact the ability of "future co-locators to use the tower without requesting a tower extension." (Exhibit F - Verizon's July 18, 2016 letter at p. 3).

85.     Verizon Wireless further agreed to implement a new technology, using an aerial drone with a digital altimeter, to video record the tree heights to confirm whether or not a tower height lower than 90 feet was feasible at the Project Site. Because tower height is mostly dictated by the need of the antennas to be above the surrounding tree canopy, this test would determine with greater accuracy (within a foot) the actual top of the canopy.   The drone test would therefore confirm the minimum tower height required to satisfy coverage objectives in the Gap Area.

86.     The drone test occurred in September 2016 and confirmed that the tree canopy surrounding the proposed communication's facility averages 85 feet in height, with one tree reaching 100 feet tall.

87.     In response to the Town's aesthetic concerns and the results of the drone test, Verizon Wireless modified the project and changed the proposed Facility from a 100-foot steel monopole tower (104 feet tall when including the 4 foot lightning rod) to a 100-foot stealth monopine tree, with the antenna centerline reduced to a height of 91 feet AGL.  *See* Exhibit B. The extra footage above the antenna array enables a naturally looking taper at the top of the monopine tree, with the branches extending out to encompass or conceal the antennas.

88.     Stealth technology enables Verizon Wireless to mask the tower as a pine tree with antennas and associated equipment concealed behind RF-transparent branches. This technology is effective in minimizing the aesthetic impact of a wireless facility. A schematic of the proposed stealth monopine tree is attached hereto at page 9 of Exhibit B.

89.     Verizon Wireless submitted a revised SEQRA Full EAF to address these project improvements. (See 9/19/16 Full EAF at page 19 of Exhibit B). Verizon Wireless also supplemented its visual resource evaluation to take into account the redesign of the Facility as a stealth monopine tree. (included at page 56 of Exhibit B).  Verizon Wireless also submitted a supplemental RF Analysis report (9/20/16 Verizon Wireless Supplemental RF analysis report by Rick Andras at page 11 of Exhibit B).

90.     On October 12, 2016, the Town's consultant, Professor Johnson, issued a second report to the Town concerning the project, which is attached as **Exhibit G** hereto. In this report, Professor Johnson addressed the RF aspects related to the location and height of the 100-foot proposed stealth monopine tree, including whether the proposed height is the minimum required height and whether the alternate sites evaluated by Verizon Wireless are viable.

91.     In his October 2016 report, Professor Johnson concludes (*inter alia*) that: (i) "[t]he proposed site is justified on the basis of LTE wireless coverage at -95 dBm threshold"; (ii) the -95 dBm coverage threshold is "reasonable" and has been used "in other comparable locations in this region"; (iii) there is a lack of 700 MHz band coverage in the Gap Area; (iv) the Project will address the wireless coverage gap in the Gap Area and address capacity problems in the Town, which "tends to support the need for a site in the general vicinity of the proposed stealth site"; (v) Verizon Wireless reduced the antenna centerline (ACL) from 100-feet to 91-feet AGL after the drone test confirmed that the average height of surrounding trees is 85-feet; (vi)

20

"the proposed 91' ACL appears reasonable"; and (vii) the combination of communication sites at Vischer Ferry and the Town's transfer station would "not meet the stated 700 MHz LTE band coverage objectives." *See* Exhibit G at p. 2 (emphasis added).

92.     In his October 12, 2016 report, Professor Johnson agreed that Verizon Wireless had demonstrated a need for the Project and that the data justifies the proposed Site. He also agreed that the propagation plots prepared by Verizon Wireless demonstrated that the four alternate sites/locations would not satisfy the coverage or capacity issues in the Gap Area and/or in surrounding sectors. *See* Exhibit G at p. 5.

93.     On December 1, 2016, Professor Johnson issued a third report to the Town to address RF-related questions that had arisen concerning the proposed Facility, a copy of which is attached hereto as **Exhibit H**.   This report confirmed that: (i) there are no human exposure concerns because the emissions from the facility will be "at levels far below the FCC thresholds anywhere on the ground near the proposed facility"; and (ii) the use by Verizon Wireless of the power level of -95 dBm as the threshold level for adequate service "is consistently used by [Verizon Wireless] in comparable sites across the region and is a reasonable level for…a '4G' system, like the one proposed…" for the Project Site.  Exhibit H at p.2.

94.     In response to comments from a few nearby residents concerning the adequacy of service in the Gap Area, Professor Johnson also reported to the Town that (i) just because some residents receive service in the gap area does not mean that the gap area does not exist; it simply means other licensed RF bands may offer some level of service in the area; (ii) Verizon's "network is growing to support the capacity demands from ever-increasing numbers of users who demand more and higher data services and speed"; and (iii) the proposed Facility "is intended to provide the necessary RF signal coverage in the new 700 MHz band for LTE services

as well as increased multi-band capacity to support those demands." *See* Exhibit H at p. 3 (emphasis added).

95.     Professor Johnson's December 1, 2016 report also confirmed that the project Site, unlike other alternate sites, "provides both the required -95 dBm level and is positioned to off-load traffic from existing sites" and further informed the Town of the trade-off for reducing the height of the Facility in terms of the reduced opportunities for co-location. *See* Exhibit H at pp. 3-4.

96.     In his fourth and final report, dated January 31, 2017, Professor Johnson agreed with Verizon Wireless that a suggested alternate site, the Barney Road water tank site, would fail to provide adequate RF coverage in the Gap Area and would fail to provide efficient capacity offload for other areas.  He also agreed with Verizon Wireless that there was sufficient foliage on the Project Site to provide adequate buffering if adjoining property owners followed through with their threatened plan to clear cut trees on their own property. A copy of this fourth report is attached as **Exhibit I** hereto.

### The Evaluation of Alternate Sites

97.     Wireless facilities are far more effective and operate far more efficiently when placed at or near the center of the target coverage and/or capacity improvement area. Proper spacing between wireless facilities is also critical from a network performance and capacity perspective.

98.     Utilizing these principles, Verizon Wireless identified the geographic area, or search ring, in which a new wireless telecommunications facility could be located to most likely provide the required coverage and capacity needs for the Gap Area. The search area was located along Grooms Road in the R-1 residential zoning district in the southeastern portion of Town

("Grooms Road Search Area"). It extends across mostly thickly-wooded, dense suburban communities, including a few large forested parcels interspersed with patches of open fields and housing lots.

99.     The Grooms Road Search area is illustrated on **Exhibit J** hereto (the full document from which this is excerpted is located at Exhibit A at page 84) and is represented by the red circle. The yellow lines represent individual property boundaries, the blue and green shaded areas are designated wetlands, and the red dot is the proposed Project location. The properties labelled "A", "B", and "C" were considered the most viable for the location of a wireless facility, whereas the property labelled "D" was removed from consideration as inaccessible and impracticable due to the presence of wetlands and the property labelled "E" was removed from consideration because it has been subdivided and is being built out as a new housing community. Parcel B was removed from consideration because the owner of the property was not interested in leasing the land for the siting of a wireless facility.

100.     Local communities generally prefer the installation of antennas and equipment on existing communication towers or other tall structures ("collocation"), rather than the construction of new towers. Verizon Wireless also prefers collocation, because it is generally less expensive and often involves a streamlined zoning application process. In the Grooms Road Search Area, however, there are no collocation opportunities to address the gap in wireless service.

101.     As its next priority, Verizon Wireless typically seeks to locate its wireless telecommunications facilities on municipally-owned property, as this is generally preferred by municipalities, because they can then benefit from the rental stream for the leased land.

102.    In an effort to work with the municipality, prior to ever submitting an application for the proposed site, Verizon Wireless and its representatives met twice with the Director of Planning and Town Attorney to request potential locations for a site on Town property or elsewhere that would best meet the Town's land use objectives.

103.    Verizon Wireless was made aware of and investigated two (2) Town properties in the general area as part of its review and analysis, even though these two locations were outside the Grooms Road Search Area: (1) the Town's transfer station off Vischer Ferry Road; and (2) Clifton Gardens Park off Ivy Lane. Location of a facility at either of these sites, however, will not resolve the inadequate service in the Gap Area.

104.    Initially, Verizon Wireless also evaluated three (3) privately owned parcels for the possible location of a communications facility. However, two of the three parcels were not suitable. Parcel A was not suitable because of adverse community impacts (e.g. visibility) and significant zoning issues (e.g. small lot size that could not achieve property line fall zone setbacks equal to 110% of the tower height), and Parcel B was not suitable because the property owners were unwilling to lease the property for the siting of a cell tower. *See* Exhibit J [illustrating parcel locations].

105.    The third privately-owned parcel that was evaluated was the Project Site; it was ultimately selected because it is located near the center of the Gap Area and satisfies RF coverage and capacity objectives, as shown in green on the propagation plot map attached as **Exhibit K** hereto. Moreover, the tower can be modestly sized and located at least 114 feet away from the nearest property line, thereby satisfying the Town's setback requirement of 110% of the overall tower height. The tower will also be located over 700 feet away from the nearest residence, will not impact any wetlands, and the location offers natural background screening by

way of mature tree lines along the north, east and south property lines that mask the facility's ground equipment and the majority of the tower from most public viewing areas.

106.     In response to comments and questions raised by the Town and the public, Verizon Wireless further evaluated whether the hypothetical location of a communications tower at the Town's transfer station, when combined with the coverage to be provided by the in-process Vischer Ferry tower collocation site, would suffice to address deficiencies in the Gap Area.  See **Exhibit L**.

107.     The requested propagation plot evaluated composite coverage from the future Vischer Ferry tower collocation site and a hypothetical 180-foot tower at the Town's transfer station and indicated that the composite coverage that would be provided by these locations would not adequately resolve the inadequate service in the Gap Area.   Professor Johnson concurred.  See Exhibit G at page 2.

108.     At the request of the Town during the review of the Project, Verizon Wireless also analyzed additional sites to determine if there were any non-residential locations that could provide adequate coverage and capacity to the Gap Area.

109.     One such alternate site was the Barney Road Town Golf Course. Verizon Wireless developed RF propagation maps to analyze whether a 100-foot tower, 125-foot tower or 150-foot tower at this Town golf course would adequately service the Gap Area. However, the analysis revealed that this location would not extend wireless coverage sufficiently to the south and/or east to provide reliable 4G coverage in the Gap Area and significant gaps would remain along the roadways. (*See* Verizon Wireless report, dated November 18, 2016, **Exhibit M** hereto).

110.     Verizon Wireless even evaluated whether it could adequately service the Gap Area by installing a 150-foot tower at the Barney Road Golf Course and a hypothetical 180-foot

tower at the Town's transfer station, taking into account the coverage that would be provided by the completion of the in-process Vischer Ferry tower collocation. Even with the addition of these three new wireless facilities, the RF data revealed that there would still be significant gaps in wireless coverage along a half mile stretch of Moe Road and across residential areas generally south of the proposed project Site. (*See* Verizon Wireless report, dated November 18, 2016, Exhibit M hereto).

111.    Moreover, even if all or both of the hypothetical, alternate facilities could provide adequate service (and they do not), they would be far less effective from a capacity offload perspective compared to the proposed Site. This is because the proposed project Site is positioned so that it is equidistant to surrounding sites and can provide significant offload capacity to its neighboring facilities, whereas the hypothetical transfer station location and the hypothetical golf course location are not centrally located and will only be able to provide limited capacity offload. In effect, the project Site offers nearly a three-fold capacity improvement over both the transfer station and golf course sites. (*See* Verizon Wireless report, dated November 18, 2016, Exhibit M).

112.    Further, location of a communications facility at the transfer station or golf course, rather than the project Site, will result in future capacity problems to the east and/or south-east within a year or two and the most logical place to develop a new site to solve this offload problem would again be the project Site. (*See* Verizon Wireless report, dated November 18, 2016, Exhibit M).

113.    Another alternate site evaluated by Verizon Wireless was the Barney Road Water Tank site, which has a 64-foot water tank and is located 1.3 miles northwest of the project Site on Clifton Park Water Authority property. As described in Verizon Wireless's January 26, 2017

report, a 100-foot tower at this location would not be able to complete reliable 4G coverage in the Gap Area.  *See* **Exhibit N**.  This alternate site also would not be able to address capacity offload from surrounding areas. The Town's own consultant confirmed these findings concerning the Barney Road water tank site. *See* Exhibit I.

114.    In all, the Town evaluated a total of seven (7) locations for the addition of a telecommunications facility (alone and in combination) to meet the service needs of the Gap Area. As confirmed by the Town's own RF consultant, the project Site is the only one of those seven locations that will adequately address the service issues in the Gap Area and surrounding environs.

### The Visual Impact Analysis

115.    On March 24, 2016, Verizon Wireless, through its consultant (Tectonic), performed an initial visual resource evaluation to determine which areas within the Town would have views of the Facility, as originally proposed as a 100-foot tall tower (104 feet tall when including the 4 foot lightning rod).

116.    The field study was conducted in the winter season during 100% leaf-off conditions, which represents a worst-case scenario because the visibility of the structure is maximized when there are no leaves on existing vegetation.

117.    Consistent with industry practice, the field study area encompassed a two-mile radius from the project Site. Tectonic employed a "balloon test", which involved floating a three-foot diameter, helium filled weather balloon at 100 feet above ground level, equivalent to the height of the proposed tower. Two additional balloons were floated at 120 feet and 140 feet to provide reference points for height and location and to provide a known dimension to aid in the production of photo simulations.

118.    Tectonic utilized computer aided modeling to determine where, in theory, one might see the tower structure upon its completion.

119.    During the balloon test, those areas from which the tower may be theoretically visible, partially visible through vegetation or concealed by vegetation are confirmed by driving the study area with the balloon in the air. The results were mapped on a View Shed Analysis Map, attached hereto as **Exhibit A** at page 114, with different colors representing visibility (green), partial visibility through vegetation (blue), concealed by vegetation (Yellow) and blocked by topography (red).

120.    Photographs were taken from various vantage points within the study area to document the actual view toward the proposed tower as well as the general character of the view shed.

121.    Based on the view shed analysis, the originally proposed tower would be substantially screened from view and would be visible or partially visible from only a small area along Grooms Road, Moe Road, Jarose Place, Arbor Lane and Carlson Way. The analysis confirmed that the proposed tower would not result in any significant visual impacts.

122.    The Town's consultant, MJ Engineering and Land Surveying, P.C. ("MJ Engineering"), confirmed that "[t]he methodology used for the visual resource evaluation is an acceptable, commonly used methodology for evaluation of potential visual impacts of an action or project and is generally consistent with industry practices."

123.    When the Facility was modified to a stealth monopine tree, Verizon Wireless – through its consultant, Tectonic - supplemented its visual impact analysis with photosimulations showing the proposed stealth monopine structure (*See* 9/20/16 Supplemental Visual Resource Evaluation by Tectonic, Exhibit B at page 56).

124.   At the request of the ZBA, by report, dated October 12, 2016, Tectonic further supplemented its visual resource evaluation to assess the proposed stealth monopine with additional carriers. This supplemental report included photo-simulations of a one-, two- and three-carrier monopine at varying heights ranging between 100 feet for the single carrier monopine and 129 feet for the three carrier monopine.

125.   After several residents threatened to cut down the trees on their property to eliminate natural screening of the proposed Facility, Verizon Wireless had its consultant, Tectonic, assess the existing on-Site vegetative cover. Tectonic issued a report, dated December 6, 2016, wherein it reported that the vegetation between the project's lease area and the property lines ranged in depth from a minimum of thirty-five feet (35') to the south of the lease area to a high a one-hundred and twenty feet (120') to the southeast of the lease area, with depths of 40' to the northeast, 80' to the east, and 90' to the north. *See* **Exhibit N** at page 55 hereto.

126.   The Town's consultant agreed that there would be sufficient on-Site vegetation to buffer the proposed Facility in the event surrounding residents clear cut their land. *See* Exhibit I (1/31/17 Johnson report).

127.   By report dated January 26, 2017, Tectonic supplemented its visual resource evaluation yet again and reported the results of a second balloon test conducted on January 21, 2017 on prior written notice to the neighbors and Town to again confirm the limited area of visibility of the proposed stealth monopine Facility. In accordance with industry practice, the study area consisted of a two-mile radius around the project Site, and involved floating a three-foot diameter, helium-filled weather balloon at 100 feet AGL to determine the visibility of the Facility from various vantage points. Photographs of the weather balloon were taken from these

vantage points and then photo-simulations of the proposed monopine were created. (*See* 1/26/17 Supplemental Visual Resource Evaluation by Tectonic, as part of Exhibit N).

128.    Yet again, the supplemental visual impact analysis confirmed the "extremely limited areas of visibility or partial visibility." (*See* Exhibit M   1/26/17 Supplemental Visual Resource Evaluation at p. 5). Modification of the Facility to a stealth monopine, rather than a steel tower, even further attenuates the limited visual impacts of the Project, "rendering the structure substantially invisible." *Id*.

129.    The visual evaluations performed by Verizon Wireless and its consultants all confirm that the Facility, as proposed, will not result in any significant visual impacts, largely because of the thick, mature trees that exist on the project Site up to an average height of 85 feet, largely obscuring the Facility.

**No Impact on Property Values**

130.    Verizon Wireless supplemented its Application with a 2015 appraisal report that was prepared for existing wireless telecommunication sites showing that the construction of a telecommunications tower at other locations had no negative effect on surrounding property values.

131.    This appraisal study confirmed that the Project would not adversely impact property values in the Town. Even so, there are very few properties that have even indirect views of the Facility and the nearest residential structure is more than 700 feet from the proposed Facility.

**No Impact to Historic Properties or Archaeological Resources**

132.    The State Historic Preservation Officer concurred that the project will not have any direct or visual effect on historic properties in the area. See **Exhibit O**.

133.    Verizon Wireless also retained CBRE, Inc. to perform a Phase I archaeological survey, dated May 28, 2016, which confirmed that the project will not impact any archeological materials or resources.

### The Town's Negative Declaration

134.    On February 7, 2017, the Town, acting as lead agency under SEQRA issued a Negative Declaration for the project (attached hereto as **Exhibit P**), finding (*inter alia*) that:

Upon request by the ZBA, the applicant examined project changes that might mitigate these potentially moderate to large impacts. Those included:

- Reduction in height of the tower
- Consideration of alternative structure type
- Identification of an alternative tower location

The applicant has offered to reduce the tower height to the lowest possible height to still allow for the tower to be functional and serve its intended purpose. It is recognized by the ZBA that a higher height would be necessary should a co-location with another carrier be desired.

The applicant has offered to modify the tower type to align more aesthetically with the surrounding wooded land uses. The applicant conducted an additional balloon test to evaluate visual impacts and the visual impacts do appear to be less sharp contrast to the monopole tower.

The applicant evaluated in detail the option of an alternative tower location. As identified in the materials provided by the applicant (RF Justification and Site Selection Analysis dated April 21, 2016 and subsequent updated materials) and reviewed by the Town's expert, other alternative locations would not provided [sic] the needed service to this specific area. A gap in service would still exist should an alternative location be selected.

After careful consideration and evaluation of all the materials provided by the applicant and understanding the importance of providing reliable cellular service to the community, it is this board's decision that the proposed action, based on project changes described above, is not anticipated to result in significant adverse environmental impacts.

## THE TOWN'S DENIAL OF THE PROJECT

135.     Despite its issuance of a SEQRA Negative Declaration and the overwhelming, uncontroverted evidence in the record compelling approval under Federal and State Law, the Town denied Verizon Wireless's application.

136.     At the February 7, 2017 public hearing on Plaintiff's Application, Defendant ZBA voted 5-2 to deny a use variance based on the Project's location in the R-1 residential zoning district, where traditional telecommunications towers (as opposed to Alternative Tower Structures) are prohibited, and the Town's determination that Verizon Wireless had not satisfied the test generally applicable to requests for use variances (but not to public utilities, such as wireless carriers).

137.     In particular, the Town held that Verizon Wireless had not established that the property owners cannot realize a reasonable return on their property in the absence of a variance or that they will suffer a unique hardship; the Town further determined that "the requested variances will alter the essential character of the neighborhood" and that "the alleged hardship by the landowner/applicant and by their…lessee, Verizon, has been self-created."   *See* Public Hearing Transcript, attached as **Exhibit Q** hereto, at pp. 121-124, 129-131.

138.     In denying the use variance, Defendant ZBA refused to treat Verizon Wireless any differently than any applicant seeking a variance and therefore refused to apply the *Rosenberg* test established by the New York Court of Appeals for wireless carriers, in their capacity as public utilities. Exhibit Q hereto at pp. 125-126.

139.     In denying the use variance, Defendant ZBA questioned whether 4G coverage was really necessary in the Town, concluding that such technology was more for "entertainment value" than for making wireless phone calls. Exhibit Q hereto at pp. 126-127.

140.    Defendant ZBA's denial was memorialized in a Notice of Decision, dated February 9, 2017 ("Decision"), which is attached hereto as **Exhibit R.**  The Decision states the grounds for denial as follows:

(i)    "The Board determined that an undesirable change or detriment to nearby properties would be produced by the granting of" a use variance from Section 208-10 of the Code (which sets forth permitted uses in an R-1 zone), from Section 208-95D(3)(h) (which states that new towers are not allowed in R-1 zones), and from Section 208-95E(3)(b) (which states that no new towers shall be constructed within 500' of the property line of an existing residential property); and

(ii)    "Notwithstanding the discussion of The "Public Utility" Standard under <u>Rosenberg</u>…, this Board's jurisdiction is to grant area variances and use variances. For Telecom applications, the Town Board has passed 208-95 of the Town Code specifically to work pursuant to the [federal TCA][and] "[u]nder 208-95, telecommunications facilities are not allowed in R-1, so it is my position that standard use criteria pursuant to 208-109C(2) of the Town Code should be applied; and

(iii)    "Under the four-pronged test for use variances, the application has not demonstrated that the lessor cannot make a reasonable rate of return on his investment at [the Project Site], nor have they met the burden to prove that this is not a hardship, and different than any other property in the neighborhood."

Exhibit R at pp. 1-2.

141.    Concerning the appropriate use variance standard to apply to the Application, the Decision states:

> The Rosenberg Standard was for public utilities and, to the extent that Verizon provides essential public service for such things as 911 calls and voice communications, necessary for public health and safety, they should be entitled to a public utility standard. The discussion of 'need' and gap in service here made it clear that the primary service Verizon needs here is data penetration for the provision of entertainment, and not for making telephone calls like what was at issue in the Rosenberg Case. So, the intent of granting public utility status is not here.

Exhibit R at p. 2.

142.    Having denied the use variance seeking relief from the prohibition of cell towers in residential zones, Defendant ZBA did not vote on the area variance seeking relief from the 500' setback requirement. *See* Exhibit Q hereto at p. 131.

33

143. Because the use variance was denied, Defendant Planning Board also did not address Verizon Wireless's application for a SUP and site plan approval, nor did the Defendant Building Department issue or deny a building permit.

144. Defendant ZBA's vote also wholly ignores the provisions of the Town's Zoning Law that classify a stealth monopine tree as an "Alternative Tower Structure" which is an allowed use in all zoning districts. *See* Town Zoning Law at 208-95(D)(3).

**IRREPARABLE INJURY, PUBLIC INTEREST, AND BALANCE OF HARDSHIPS**

145. As a result of the Defendants' actions, Verizon Wireless has been, and will continue to be, damaged and irreparably harmed absent the relief requested herein.

146. The harm caused by Defendants' unlawful actions includes, but is not limited to, an effective prohibition on Verizon Wireless's ability to provide personal wireless service in the Gap Area of the Town, and impairment of Verizon Wireless's (a) ability to provide the public in the Town with adequate and reliable service; (b) ability to compete with other providers of telecommunication services; (c) full use of its existing licenses and business investments; and (d) good will and business reputation.

147. The harm that Verizon Wireless has suffered and is suffering from the Defendants' actions is not reasonably susceptible to accurate calculation, and cannot be fully and adequately addressed through an award of damages.

148. Moreover, the public interest in promoting competition in the telecommunications arena and the prompt deployment of services – the express goals of the TCA – has been irreparably harmed and will continue to be irreparably harmed by Defendants' unlawful actions. Verizon Wireless's present and future customers, the public at large and emergency service providers are significantly prejudiced by the Defendants' unlawful conduct.

149.     In addition, wireless telecommunications are an important component of public safety and emergency response systems, and provide a vital alternative to traditional land lines during times of public crisis. By preventing Verizon Wireless from installing equipment needed to provide adequate service, the Defendants' unlawful actions are causing irreparable harm to the public interest in deprivation of reliable emergency communications.

150.     Verizon Wireless's Application for approval of the Facility to service the Gap Area has been pending since May 2, 2016, a period of more than ten (10) months. This delay in approval is causing irreparable harm to Verizon Wireless and the public interest.

151.     In contrast to the immediate and irreparable injury being suffered by Verizon Wireless, its customers, and the public interest, the Defendants will not suffer any significant injury if the Court issues the requested injunction. Defendant Town has issued a Negative Declaration attesting to the fact that the proposed Facility will not result in any significant adverse impacts. Moreover, Verizon Wireless has met all of the requirements for the land use approvals it seeks under controlling State and Federal law and/or precedent.

## ALLEGATIONS SUPPORTING DECLARATORY RELIEF

152.     A present and actual controversy has arisen and now exists between the parties regarding their respective legal rights and duties. Verizon Wireless contends that the Defendants' actions are in violation of the TCA and New York State law and that Verizon Wireless is entitled to all of the approvals necessary to proceed with the Project. Upon information and belief, Defendants deny these allegations.

153.     Verizon Wireless and the public have been and will continue to be adversely affected by the Defendants' unlawful acts and any further delay in approval and construction of the Project.

154.    Accordingly, declaratory relief is appropriate and necessary to adjudicate the extent of Verizon Wireless's rights and Defendants' duties and authority.

## COUNT I
## THE TOWN HAS UNLAWFULLY PROHIBITED THE PROVISION OF PERSONAL WIRELESS SERVICES IN VIOLATION OF THE TCA, 47 U.S.C. §332(c)(7)(B)(i)(II)

155.    Verizon Wireless re-alleges, repeats and incorporates by reference, as if fully set forth herein, all preceding paragraphs.

156.    The TCA provides, in relevant part, that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof…shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. §332(c)(7)(B)(i)(II).

157.    The Facility is a "personal wireless service facilit[y]" providing "personal wireless services" within the meaning of the TCA.

158.    A prohibition on the provision of personal wireless services occurs within the meaning of the TCA when there is a significant gap in a wireless carrier's service and the proposed Facility is the least intrusive means to fill that gap.

159.    The record shows that Verizon Wireless has a significant gap in service in the Town of Clifton Park, a fact with which the Town's RF consultant specifically agreed.

160.    The record further demonstrates that the proposed Facility, which would be substantially concealed and camouflaged as a stealth monopine behind a thick and mature set of tall trees and would be located more than 700' from the nearest residential structure after review of at least seven alternative locations, alone or in combination, is the least intrusive means to fill that gap.

161.    While the Town's Code prohibits the location of communications towers (other than Alternative Tower Structures) in residential zones, such as the R-1 zoning district, the record demonstrates that the proposed Facility must be located in the R-1 residential zoning district of the Town in order to fill the wireless service gap and to adequately address the service needs of the Gap Area in that residential zone.

162.    The record further shows that it is impossible to comply with the 500' lot line setback for communications towers (other than Alternative Tower Structures) in this residential zone of the Town because of the relatively small size of most residential lots and the lack of any suitable, larger sites to adequately service the coverage and capacity needs of the Gap Area.

163.    Verizon Wireless has proposed a stealth monopine tower to substantially conceal the facility.

164.    Verizon Wireless's Application fulfills all of the criteria and requirements for approval of the project under the Town's Zoning Code and/or New York State law.

165.    A stealth monopine tree qualifies as an "Alternative Tower Structure" under the Town's Zoning Law and is an allowed use in all zoning districts and does not require the issuance of a use variance.

166.    The Defendants' unsupported and legally unsustainable denial of Plaintiff's Application has had and will have the continued effect of prohibiting Verizon Wireless from providing wireless services pursuant to its FCC license in violation of 47 U.S.C. §332(c)(7)(B)(i)(II).

167.    Verizon Wireless has suffered and will continue to suffer irreparable injury as a result of Defendants' violation of the TCA.

## COUNT II
## THE TOWN HAS UNLAWFULLY DENIED VERIZON WIRELESS'S APPLICATION WITHOUT SUBSTANTIAL EVIDENCE IN THE WRITTEN RECORD IN VIOLATION OF THE TCA, 47 U.S.C. §332(c)(7)(B)(iii).

168.    Verizon Wireless re-alleges, repeats and incorporates by reference, as if fully set forth herein, all preceding paragraphs.

169.    Section 332(c)(7)(B)(iii) of the TCA provides that:

> Any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record.

170.    The Facility is a "personal wireless service facility" as defined in the TCA.

171.    Defendant ZBA voted to deny Plaintiff's Application for a use variance on February 7, 2017 and reduced that vote to a written Decision on February 9, 2017.

172.    Defendants' Decision also appears to deny Plaintiff's Application for an area variance from the 500' setback requirement and/or, at a minimum, makes evident that such a denial is a foregone conclusion.

173.    Defendants have violated Section 332(c)(7)(B)(iii) of the TCA, because their denial of Plaintiff's Application is not based on substantial evidence and is, in fact, contrary to the evidence, the Negative Declaration, the expert opinions of the Town's own consultants and the advice of the Town Attorney.

174.    Furthermore, owing to its proper classification as an "Alternative Tower Structure", a use variance is unnecessary for the construction of a stealth monopine tree in any zoning district.

175.    Verizon Wireless has suffered and will continue to suffer irreparable injury as a result of Defendants' violation of the TCA.

## COUNT III
## THE TOWN IS FEDERALLY PREEMPTED FROM DENYING VERIZON WIRELESS'S APPLICATION ON TECHNICAL GROUNDS

176.    The Supremacy Clause of the U.S. Constitution, found at article VI, clause 2, declares that "the Laws of the United States…shall be the supreme Law of the Land…any Thing in the Constitution or Laws of any State to the contrary notwithstanding."

177.    Under the Supremacy Clause, State and local laws and actions that conflict with the dictates of federal law, either explicitly or implicitly, are preempted and must yield to federal law.

178.    One of the main aims of the TCA is "to accelerate rapidly private sector deployment of advanced telecommunications and information technologies and services to all Americans by opening all telecommunications markets to competition." See H.R.Rep. No. 104-458, at 113 (1996), *reprinted in* 1996 U.S.C.C.A.N. 10, 124.

179.    The TCA is administered by the FCC, which was created:

> For the purpose of regulating interstate and foreign commerce in communication by wire and radio so as to make available, so far as possible, to all people of the United States…a rapid, efficient, Nation-wide, and world-wide wire and radio communication service with adequate facilities at reasonable charges, for the purpose of the national defense, for the purpose of promoting safety of life and property through the use of wire and radio communications, and for the purpose of securing a more effective execution of this policy by centralizing authority heretofore granted by law to several agencies and by granting additional authority with respect to interstate and foreign commerce in wire and radio communications…

47 U.S.C. §151.

180.    The FCC, as the federal agency charged with administering the TCA and regulating the wireless telecommunications industry, issued a Declaratory Order on November 19, 2009 to clarify and interpret the TCA ("FCC Order").  The FCC order states as follows:

> *Delays in the processing of personal wireless service facility siting applications are particularly problematic as consumers await the deployment of advanced wireless communications services, including broadband services,* in all geographic areas in a timely fashion. Wireless providers currently are in the process of deploying broadband networks which will enable them to compete with the services offered by wireline companies…in the 700 MHz band, the Commission adopted stringent build out requirements precisely to ensure the rapid and widespread deployment of services over this spectrum. State and local practices that unreasonably delay the siting of personal wireless service facilities threaten to undermine achievement of the goals that the [FCC] sought to advance in these proceedings. *Moreover, they impede the promotion of advanced services and competition that Congress deemed critical in the TCA…*

[emphasis added]

181.    Accordingly, the FCC agrees that the promotion of advanced services and competition is of critical importance under the TCA. This would include the provision of Verizon Wireless's advanced 4th Generation (4G) LTE services in the Gap Area of the Town.

182.    It is the stated "policy of the United States to encourage the provision of new technologies and services to the public." 47 U.S.C. §157(a).

183.    Federal law further provides that "[n]o State or local statute or regulation, or other State or local legal requirement, may prohibit or have the effect of prohibiting the ability of any entity to provide *any* interstate or intrastate telecommunications service." 47 U.S.C. §253(a)(emphasis added).

184.    Through the TCA, the federal government has expressly limited the authority of State and local governments to regulate personal wireless service facilities, like the proposed Facility. *See* 47 U.S.C. §§332(c)(7)(A) and (B).

185.    The Town's authority over zoning and land use matters, as circumscribed by Section 332(c)(7) of the TCA, does not extend to technical and operational matters, over which the FCC and the federal government have exclusive authority.

186.    Rather, because of the FCC's pervasive regulation of broadcasting technology, the Town is preempted from exercising its zoning power based on matters directly regulated by the FCC or based on the Town's independent assessment regarding the wisdom or necessity of certain wireless communications technology or operational standards.

187.    Put simply, the Town is preempted from regulating the technological and operational standards of wireless carriers and is therefore preempted from making zoning decisions based on its independent (and unfounded) determination concerning the wisdom or need for advanced wireless technologies authorized, approved and/or licensed by the FCC, such as Verizon Wireless's advanced 4G LTE services.

188.    Pursuant to the FCC's delegated powers and the federal policy of encouraging new and advanced technologies and services to the public, the FCC has issued a license to Plaintiff Verizon Wireless to provide advanced 4G LTE wireless telecommunications services in the Town.

189.    By its Application and pursuant to its FCC license, Verizon Wireless sought to construct and operate a Facility to provide these advanced 4G LTE wireless telecommunications services to the identified Gap Area in the Town.

190.    In denying that Application, however, the Town erroneously and contrary to statute, FCC Orders and the Presidential Proclamation determined that Verizon's 4G services were not needed for the provision of safe and adequate wireless service in the Gap Area and that the Facility would only enhance RF coverage and capacity for entertainment purposes. *See* Exhibit Q at p. 126 [Transcript] and Exhibit R [Town's Decision].

191.    The Town's denial improperly dictates and directs a preference for old and outdated wireless communication systems and effectively bans the introduction of new and/or

41

advanced wireless technology, which is contrary to the express purposes of the TCA, the FCC Order and the federal policy in 47 U.S.C. §157(a).

192.    Further, the Town's denial interferes with Congress' goal of ensuring safe and adequate service for all members of the public and of facilitating the spread of new technologies and the growth of wireless service.

193.    The Town's denial also runs counter to the FCC mandates at 47 CFR §§ 22.940 and 24.16 that each wireless carrier provide "substantial service", defined as service that is sound, favorable, and substantially above a level of mediocre service, in its licensed service area or risk having its license revoked.

194.    The Town cannot interfere with the federal government's regulation of the technical and operational aspects of wireless telecommunications technology by refusing to allow advanced wireless technologies into their communities by carriers, like Verizon Wireless, who have been federally licensed to provide those advanced services.

195.    Verizon Wireless has suffered and will continue to suffer irreparable injury as a result of Defendants' preempted acts and is entitled to a declaration that the Town is federally preempted from denying its Application based on technical and operational matters, such as the Town's unfounded determination that Verizon Wireless's advanced 4G LTE service is not needed in the Gap Area of the Town.

**COUNT IV**
**ARTICLE 78 OF THE NEW YORK CIVIL PRACTICE LAW AND RULES**

196.    Verizon Wireless re-alleges, repeats and incorporates by reference, as if fully set forth herein, all preceding paragraphs.

197.     Article 78 of the New York Civil Practice Law and Rules ("CPLR") provides a device for challenging the official acts of State and local officials, including the Defendants herein.

198.     CPLR §7803 provides a right of action against a government body where a question is raised as to (i) whether it has "failed to perform a duty enjoined upon it by law"; (ii) whether it has "proceeded, is proceeding or is about to proceed without or in excess of jurisdiction",  (iii) whether "a determination was made in violation of lawful procedure, was affected by an error of law or was arbitrary and capricious or an abuse of discretion.."; or (iv) whether "a determination made as a result of a hearing held, and at which evidence was taken, pursuant to direction by law is, on the entire record, supported by substantial evidence."

199.     Defendants' determination to deny Verizon Wireless's Application was not supported by substantial evidence in the record, was arbitrary and capricious, was an abuse of discretion, was affected by an error of law and/or was made in violation of lawful procedure.

200.     Verizon Wireless has suffered injury as a result of Defendants' violations of Article 78 of the CPLR and has timely commenced this action.

**WHEREFORE**, Plaintiff Verizon Wireless respectfully requests that this Court issue an Order and Judgment:

a.     Declaring that Defendants' denial of Verizon Wireless's Application prohibits or has the effect of prohibiting the provision of wireless service in violation of 47 U.S.C. §332(c)(7)(B)(i)(II);

b.     Declaring that Defendants' denial of Verizon Wireless's Application constitutes a violation of 47 U.S.C. §332(c)(7)(B)(iii) in that it is not supported by substantial evidence contained in the written record;

c.    Declaring that the Defendants are federally preempted from regulating the technological and operational standards of wireless carriers and are therefore preempted from denying Verizon Wireless's Application based on their independent determinations or assessments concerning the wisdom or need for advanced wireless technologies authorized, approved and/or licensed by the FCC, such as Verizon Wireless's advanced 4G LTE services;

d.    Declaring that the Defendants are in violation of Federal and New York State law;

e.    Declaring that the Defendants' denial of Verizon Wireless's Application was affected by an error of law, was arbitrary and capricious and an abuse of discretion, and was not supported by substantial evidence based on the entire record;

f.    Ordering, directing, and enjoining the Defendants to immediately issue all approvals and permits necessary to allow construction and operation of the proposed Communications Facility, including (without limitation) all building permits, site plan approvals, special use permits, and variances;

g.    Awarding Verizon Wireless the costs, disbursements, and expenses of this action, including reasonable attorneys' fees; and

h.    Granting such other and further relief as this Court deems just and proper.

David C. Brennan Bar Number: 510392

**s/ Kristin Carter Rowe**
Kristin Carter Rowe Bar Number: 301098

*Attorneys for Cellco Partnership d/b/a Verizon Wireless*

Young/Sommer LLC
5 Palisades Drive, Suite 300
Albany, New York 12205
Telephone: (518) 438-9907
Fax: (518) 438-9914
e-mail: dbrennan@youngsommer.com
        krowe@youngsommer.com